IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1 16 CR 142 |
| | ) | |
| PAUL L. SHOCKLEY, | ) | Title 18, United States Code, |
| | ) | Sections 1341 (Mail Fraud), |
| Defendant. | ) | 1343 (Wire Fraud) |
| | ) | |

**JUDGE POLSTER**

The United States Attorney charges:

**I.    GENERAL ALLEGATIONS**

At all times material to this Information:

1.      Defendant PAUL L. SHOCKLEY ("Defendant") resided in the Northern District of Ohio.

2.      Victim 1 and her husband, Victim 2, resided in the state of New York.  Victim 3 and her husband, Victim 4, also resided in the state of New York.  Victim 3 is a daughter of Victim 1 and Victim 2.

3.      At certain times material to this matter, Defendant and others established certain businesses, including D'Legato Estates and Facilities, LLC, D'Legato Group, LLC, and Wintermyer and Shockley Enterprise, LLC  (together, "D'Legato").  D'Legato was purportedly a start-up business venture that would engage in the business of operating an assisted living center.

4.     At certain times material to this matter, Defendant was in a romantic relationship with D.W.  Defendant, D.W., A.W. (D.W.'s mother), and others were purportedly responsible for establishing and operating D'Legato.

5.     Defendant and others caused D'Legato to open and maintain a bank account, account *6847, at Huntington National Bank (the "D'Legato Bank Account").

6.     Defendant and others caused D'Legato to open and maintain credit card accounts at U.S. Bank NA (together, the "D'Legato Credit Card Accounts").

7.     On or about April 13, 2015, Defendant and others formed We Loves Snobs, LLC ("We Love Snobs").  We Love Snobs was purportedly engaged in the business of operating an on-line luxury consignment store.

8.     Defendant and others caused We Love Snobs to open and maintain a bank account, account *4934, at CF Bank (the "We Love Snobs Bank Account").

9.     Victim 5 and her mother, Victim 6, resided in the Northern District of Ohio.

**II.     COUNTS 1-2, MAIL FRAUD, 18 U.S.C. § 1341**

10.     From approximately 2013 through 2015, Defendant and others known and unknown to the United States Attorney devised a scheme to defraud Victim 1 and her family (together, the "investors"), and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, (1) by causing the investors to invest in D'Legato through false and fraudulent misrepresentations and omissions of material facts about the nature and dispositions of the investments, and (2) using the credit card accounts and personal identifying information of victim investors without authority.

It was part of the scheme that:

11.     Defendant and others misled investors to believe that their funds would be used to establish and operate an assisted living center, when, in fact, they intended to divert and did divert the funds to enrich themselves.

12.     Defendant and others misused investor money, while continuing to lead the investors to believe a substantial return on their investments was forthcoming.

13.     Defendant and others used the following techniques to induce the investors to invest with D'Legato:

   a.  To assimilate himself and establish relationships of trust, Defendant claimed that he wanted to provide business opportunities to the investors and help bring them financial independence and security.

   b.  To lend credibility to his purported goals and other business activities, Defendant routinely claimed to investors that he was significantly wealthy, when he then well knew, he was not. Among other things, Defendant falsely claimed that his mother was in control of a group of highly successful businesses (together, the "Shockley family businesses"), when Defendant then well knew that she did not.

   c.  To make D'Legato appear functional, Defendant took investors and others on trips to view potential properties for an assisted living center, when as he then well knew, D'Legato would not and could not purchase the properties.

   d.  To provide a false sense of security to investors, Defendant and others claimed that D'Legato (i) had in place other investors, (ii) had purchased certain properties, and (iii) had employees or staff, when they then well knew, they did

3

not have other investors, had not purchased certain properties, and did not have employees or staff.

      e.  To induce investors to invest in D'Legato, Defendant and others promised that any D'Legato investment would realize a substantial return, when as they then well knew, it would not.

14.    Defendant and others defrauded the investors of more than $400,000.00, which funds he and others received, in the form of investment checks and unauthorized credit card transactions.

15.    Defendant and others misused investor money to personally enrich themselves by paying for, among other things, personal expenses, gambling, luxury car payments, exotic vacations, and luxury shopping sprees.

16.    The investors did not receive the hundreds of thousands of dollars of gains on their investments that Defendant and others falsely promised to them during the scheme.

### A.    Unauthorized Use of Credit Cards

17.    In November 2013, Defendant visited the home of Victim 1 and Victim 2 in Conklin, New York for a family wedding. While at their home, Defendant falsely claimed to Victim 1 and Victim 2, as he had on previous occasions, that he was significantly wealthy and a multi-millionaire.

18.    At the conclusion of the wedding weekend, Defendant asked Victim 1 for money because he claimed he had insufficient resources to return home from New York. Defendant induced Victim 1 to provide Defendant her personal credit card for the sole purpose of making small gas and food purchases related to Defendant's trip home from New York. Defendant,

however, charged thousands of dollars on Victim 1's credit card, which was much more than Victim 1 had authorized Defendant to charge.

19. In or around this same time, Victim 1 began to receive e-mails from someone claiming to be M. Shockley (hereinafter, "M.S."). "M.S." claimed to be Defendant's mother, while M.S. was, in fact, Defendant falsely purporting to be his wealthy mother. Defendant, posing as M.S., convinced Victim 1 to provide her personal identifying information and personal credit card information to M.S. and Defendant under the false representation that Victim 1's credit card bills would be paid off through the purported Shockley family businesses' voucher system. In or around December 2013, at Defendant's urging, Victim 1 mailed her own and Victim 2's credit cards and personal identifying information to "M.S." at an address in Lisbon, Ohio, located in the Northern District of Ohio.

20. In or around that same time, at Defendant's urging, Victim 1 provided Defendant with access to her and her husband's personal credit cards for the purpose of making purchases related to the purported Shockley family businesses, under Defendant's false representation that the Shockley family businesses could then pay off the credit cards in full through the businesses' voucher system. Defendant, however, charged thousands of dollars on Victim 1 and Victim 2's credit cards, which was much more than they had authorized Defendant to charge. Defendant also made unauthorized use of Victim 1 and Victim 2's personal identifying information by applying for, and receiving, additional credit cards in Victim 1 and Victim 2's names. Defendant made unauthorized purchases on these credit cards and also concealed certain bank statements from Victim 1 and Victim 2 to prevent the fraud from being discovered. Contrary to Defendant's false representations and promises, Victim 1 and Victim 2's credit cards were never paid off in the Shockley family businesses' voucher system, as Defendant claimed they would.

Rather, Defendant and others incurred more than $308,000.00 in unauthorized purchases and cash advances on Victim 1 and Victim 2's credit cards.

**B.    The D'Legato Investment Scheme**

21.    Defendant and others also urged the investors to invest funds in D'Legato. Defendant represented to the investors that D'Legato was an assisted living business and that D.W. and A.W., along with Defendant, would be responsible for establishing and operating D'Legato. In fact, however, neither Defendant, D.W., A.W., nor D'Legato had ever owned or operated any facility as an assisted living center. Defendant and others falsely represented to the investors that their funds would be invested in D'Legato, when they then well knew they intended to divert and did divert the funds to personally enrich themselves. Defendant and others falsely promised the investors they would make a substantial return on their investment in D'Legato. Defendant and others also made material omissions of fact to the investors including that they never told the investors they intended to, and in fact did, use their D'Legato investment funds to personally enrich themselves and others.

22.    Through these false representations and omissions, Defendant and others caused Victim 1 and Victim 2 to liquidate their retirement savings to invest in D'Legato. In fact, Defendant persuaded Victim 1 to use part of her retirement savings to make substantial payments on the unauthorized credit card transactions Defendant and others had made by falsely stating to Victim 1 the payments would be credited as part of her "investment" in D'Legato, on which she would purportedly make a substantial return.

23.    In order to create a false sense of urgency for the investors and cause them to invest additional funds in D'Legato, Defendant and others also falsely represented to the

investors that a large investor had pulled out of D'Legato, and without additional funds from the
investors, D'Legato would fail, and the investors would lose their substantial investments.

24.     Based on these false representations and omissions, the investors invested
substantial amounts of money into D'Legato.  Between on or about June 2, 2014 and October 23,
2014, the investors mailed seven (7) investment checks, totalling $95,488, through U.S. mail and
private commercial carriers from New York to the Northern District of Ohio.  The checks were
drawn upon personal financial accounts in the names of the investors.  D.W. deposited the
investment checks into the D'Legato Bank Account, including on or about August 15, 2014,
when he deposited check #165, drawn on the account of Victim 1 and Victim 2, into the
D'Legato Bank Account.

25.     The investors never received any return on the investment they made with
D'Legato.  Rather, Defendant and others personally enriched themselves by using the investment
money in the D'Legato Bank Account to make payments on the D'Legato Credit Card Accounts
on which Defendant and others made significant personal expenditures.

### C.     Use of Mails

26.     On or about the dates listed below, in the Northern District of Ohio, Eastern
Division, and elsewhere, Defendant, for the purpose of executing the scheme and artifice, caused
the following matters to be delivered by the United States Postal Service and private and
commercial interstate carrier, from New York to the Northern District of Ohio, in accordance
with the directions thereon, each constituting a separate count:

| Count | Date | Description |
|-------|------|-------------|
| 1 | December 13, 2013 | FedEx package of Victim 1 and Victim 2's credit card and personal identifying information |
| 2 | August 15, 2014 | Check #165 from the account of Victim 1 and Victim 2 made payable to D'Legato Properties |

In violation of Title 18, United States Code, Section 1341.

### III.     COUNT 3, WIRE FRAUD, 18 U.S.C. § 1343

#### A.     The We Love Snobs Fraudulent Scheme

27.     The factual allegations in paragraphs 1, and 7 through 9, are re-alleged and incorporated by reference in this count, as though fully restated herein.

28.     From in or around January 2015 through in or around December 2015, Defendant and others known and unknown to the United States Attorney devised a scheme to defraud Victim 5 and Victim 6 (together, "the investors"), and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, by causing investors to invest in We Love Snobs.  Defendant and others misled investors to believe that their funds would be used to establish and operate an online luxury consignment store, when, in fact, they intended to divert and did divert the funds to enrich themselves and pay personal expenses of Defendant and others.

It was part of the scheme that:

29.     Defendant and others misused investor money, while continuing to lead the investors to believe a substantial return on their investments was forthcoming.

30.     Defendant and others used the following techniques to induce the investors to invest with We Love Snobs:

a.  To lend credibility to his purported business activities, Defendant routinely claimed to investors that he was significantly wealthy, when he then

8

well knew, he was not. Among other things, Defendant falsely claimed that his
mother was in control of the purported Shockley family businesses, when
Defendant then well knew, she was not.

b. To induce investors to invest in We Love Snobs, Defendant and others
promised that any We Love Snobs investment would realize a substantial return,
when they then well knew it would not.

31. Defendant and others misused investor money to personally enrich themselves by
paying for, among other things, personal expenses, luxury shopping sprees, and exorbitant
salaries. Although some investors received a fractional return of their investments, the investors
incurred substantial losses. In addition, the investors did not receive the hundreds of thousands
of dollars of gains on their investments that Defendant and others falsely promised to them
during the scheme.

32. In or around February 2015, Victim 5 applied for a job at We Love Snobs. In
order to induce Victim 5 to work at We Love Snobs, Defendant falsely claimed, among other
things, that We Love Snobs would make millions of dollars by the end of 2015.

33. Shortly after Victim 5 began to work at We Love Snobs, Defendant and others
began to urge Victim 5 to invest money in We Love Snobs. In order to induce Victim 5 to invest
money in We Love Snobs, Defendant falsely claimed he was significantly wealthy and that he
had personally invested $20,000 in We Love Snobs. Defendant further falsely represented to
Victim 5 that he would personally guarantee her investment and that Victim 5 would realize a
substantial return on her investment by the end of 2015. Defendant never informed Victim 5 that
her investment money would be used to pay for Defendant's personal expenses.

34.     Defendant met Victim 6 through Victim 5.  After Victim 5 began to work at and invest in We Love Snobs, Defendant began to urge Victim 6 to invest in We Love Snobs.  In or around March 2016, Defendant and others conducted an investment presentation for Victim 6 for the purpose of persuading Victim 6 to invest money in We Love Snobs.  Victim 5 attended the presentation.

35.     Both during this presentation and at other times, Defendant falsely represented to the investors that their funds would be invested in We Love Snobs, when he then well knew he intended to divert and did divert the funds to personally enrich himself and others.  Defendant falsely promised the investors they would make a substantial return on their investment in We Love Snobs.  Defendant also made material omissions of fact to the investors, including that he never told the investors he intended to, and in fact did, use their investment funds to personally enrich himself and others.  In order to conceal the fraudulent scheme and create a false sense of security for the investors, Defendant also falsely represented that personal expenditures he was making from the We Love Snobs Bank Account were being paid with his and his family's investment in We Love Snobs, which he then well knew, was not true.

36.     Based on these false representations and omissions, the investors invested substantial amounts of money into We Love Snobs.  Between on or about February 27, 2015 and on or about April 1, 2015, the investors caused funds to be wired into the We Love Snobs Bank Account.  Defendant and others fraudulently spent the We Love Snobs investment money by, among other things, making significant personal expenditures, including expensive shopping sprees and paying themselves exorbitant salaries.